IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | |
|---|---|
| JAMES RIVER COMPANIES, LLC, | Case No. 4:13-cv-00004 |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION** |
| BB BUGGIES, INC., and TEXTRON, INC., | By: Jackson L. Kiser |
| Defendants. | Senior United States District Judge |

Before me is Defendants' Motion for Partial Summary Judgment [ECF No. 26], which was filed on August 5, 2013. Plaintiff filed a timely Response in Opposition to Defendants' Motion [ECF No. 30] on August 19, 2013, and Defendants filed their Reply [ECF No. 36] on August 23, 2013. On August 26, 2013, I heard oral arguments from both sides outlining their respective positions on the law, the facts, and the nature and extent of the record. Having thoroughly reviewed the record and arguments of counsel, the matter is now ripe for decision. For the reasons stated below, I hereby **GRANT** Defendants' Motion in part and **DENY** Defendants' Motion in part.

## STATEMENT OF FACTS[1]

This case arises under the Virginia Equipment Dealers Protection Act, Va. Code Ann. §§ 59.1-352.1, *et seq.* ("the Act"), which requires that, upon termination of a dealer-supplier relationship, a supplier must repurchase any new, unsold, undamaged inventory from a dealer within ninety days. Plaintiff, James River Companies, LLC ("Plaintiff" or "James River"),

---

[1] The following facts are presented in the light most favorable to Plaintiff, the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

requests that Defendants, BB Buggies, Inc., and Textron, Inc.[2] (collectively "Defendants"), repurchase twelve (12) buggies, including: ten (10) Bad Boy Buggy XT model buggies; one (1) 2007 Bad Boy Buggy Classic model buggy; and one (1) 2008 Bad Boy Buggy Classic model buggy. Plaintiff also seeks damages arising from Defendants' failure to repurchase these vehicles, including storage fees, uncompleted warranty work, loan interest, transit fees for moving the vehicles to Plaintiff's facility in Danville, Virginia, judgment interest, and attorney's fees.

The parties' business relationship began in 2006 when Plaintiff entered into an oral dealer agreement with Bad Boy Enterprises, LLC ("Bad Boy Enterprises"). Pursuant to their agreement, Plaintiff purchased several Bad Boy Buggy vehicles, to wit: one (1) 2007 Bad Boy Buggy Classic model buggy on November 26, 2007; one (1) 2008 Classic model buggy on July 30, 2008; and ten (10) XT model buggies in June 2010. Shortly thereafter, Bad Boy Enterprises stopped manufacturing the XT model and replaced it with the XTO. (See Def.'s Ex. D, ¶ 5.) In October 2010, Bad Boy Enterprises sold its assets to BB Buggies, the current defendant. Pursuant to an asset purchase agreement, BB Buggies took over manufacturing the Bad Boy Buggies line of products, including the XTO model buggy. (See id. at ¶¶ 3-4.) BB Buggies never manufactured the XT model. (See id. at ¶ 7.)

In December 2010, Plaintiff expressed an interest in having BB Buggies replace the ten XT models with new XTO model buggies. At that time, Philip Jhant, then-Director of Specialty Sales for BB Buggies, met with Chris Johnson and Doug Cooke from James River to discuss the possibility. (See id. at ¶ 8.) At this meeting, BB Buggies represented that they might be amenable to such a deal, but maintained that a repurchase agreement was contingent upon the

---

[2] BB Buggies is a wholly-owned subsidiary of Textron, Inc. (See Def.'s Answer [ECF No. 18] ¶ 2.)

parties entering into a written dealer contract.[3] (See id. at ¶ 9.) After the meeting, BB Buggies sent Plaintiff a copy of the standard BB Buggies, Inc., U.S. Distribution Agreement. The parties attempted to negotiate the terms of the written instrument through the summer of 2011, but were never able to agree on its terms. (See id. at ¶ 11; see also Def.'s Ex. F.)

On November 8, 2011, Plaintiff, through its attorney, formally requested in writing that Defendants repurchase Plaintiff's Bad Boy Buggy inventory, consisting of twelve (12) buggies, worth a total of $156,200. (See Pl.'s Am. Compl. [ECF No. 17] ¶ 29-30.) On November 23, 2011, Plaintiff's attorney sent Defendants a letter formally terminating the parties' contractual relationship, effective ninety days later on February 21, 2012. (See Def.'s Ex. I.) On December 19, 2011, Defendants purportedly learned that Plaintiff's inventory might be encumbered by one or more liens and requested that Plaintiff indicate how it was going to provide clear title to the vehicles. (See Def.'s Ex. J.) On April 16, 2012, Plaintiff, through its attorney, responded that the vehicles were free from any encumbrances. (See Def.'s Ex. K.) In May 2012, Defendants sent Mr. Dennis Brouillard to Plaintiff's storage facility to inspect the vehicles for repurchase. In the course of his investigation, Mr. Brouillard found that two of the buggies were damaged. Specifically, Mr. Brouillard found that the 2008 Classic model was worn, the seat back was broken off, the fender flair was torn, and the batteries had acid and corrosive build-up. (See Def.'s Ex. L.) Mr. Brouillard also found that one of the XT models had a small tear on the top of the passenger side seatback. (See id.)

On February 6, 2013, Plaintiff instituted this suit under the Virginia Equipment Dealers Protection Act. (See Am. Compl. [ECF No. 17] ¶ 1.) Plaintiff alleges that Defendants' failure to repurchase ten XT model buggies and two Classic model buggies entitles Plaintiff to the

---

[3] It is not clear which party initially requested a written agreement. It is clear, however, that the parties attempted to reach a written agreement from December 2010 through the summer of 2011.

following damages: $124,081.75 for repurchase of the vehicles; $22,500 for storage fees incurred from May 2011 through May 2013; $4,095.03 for loan interest from February 2, 2011, through October 1, 2011; $2,615.30 for transit fees incurred to move the vehicles to Plaintiff's facility; and $18,390.26 for judgment interest, at six (6) percent, from October 1, 2011, through May 2013. (See Pl.'s Int. Ans. No. 8; Def.'s Ex. A.) On August 5, 2013, Defendants moved for partial summary judgment.

## STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); George & Co. LLC v. Imagination Entm't Ltd., 575 F.3d 383, 392 (4th Cir. 2009). A genuine dispute of material fact exists "[w]here the record taken as a whole could . . . lead a rational trier of fact to find for the nonmoving party." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (internal quotation marks and citing reference omitted); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). On a motion for summary judgment, the facts are taken in the light most favorable to the non-moving party insofar as there is a genuine dispute about those facts. See Anderson, 477 U.S. at 255. At this stage, however, a court's role is not to weigh the evidence, but simply to determine whether a genuine dispute exists, making it appropriate for the case to proceed to trial. See id. at 249. To withstand a motion for summary judgment, the non-moving party must produce sufficient evidence from which a reasonable jury could return a verdict in his favor. See id. at 248. "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of the non-movant's case." Thompson v. Potomac Electric Power Co., 312 F.3d 645, 649 (4th Cir. 2002).

## DISCUSSION

The Virginia Equipment Dealers Protection Act provides that no supplier "may terminate, cancel, fail to renew, or substantially change the competitive circumstances of an agreement without good cause." Va. Code Ann. § 59.1-352.3(A) (2013). When a dealer agreement is terminated by either party, the Act provides that "[t]he supplier shall repurchase from the dealer within ninety days after termination of the agreement all inventory previously purchased from the supplier that remains unsold on the date of termination of the agreement." See id. § 59.1-352.5. The supplier is required to repurchase all "new, unused, unsold, undamaged and complete farm, construction, utility, and industrial equipment" at the full current net price. Id. § 59.1-352.5. If a supplier does not repurchase inventory it is required to repurchase, then the supplier is "liable for one hundred percent of the current net price of the inventory, any freight charges paid by the dealer, the dealer's reasonable attorney's fee and court costs, and interest on the current net price of the inventory." Id. § 59.1-352.10(A).

### I. Statutory Exceptions to the Repurchase Requirement

Defendants first move for summary judgment based on four statutory exceptions to the Act's repurchase requirement. Relevant to this case, the Act excludes from repurchase: (1) equipment that is not a "current model"; (2) equipment "purchased more than thirty-six months prior to notice of termination of the agreement"; (3) "inventory for which the dealer does not have title free of all claims, liens, and encumbrances other than those of the supplier"; and (4) equipment that is "not in new, unused, undamaged, complete condition." Va. Code Ann. § 59.1-352.6. As discussed below, however, genuine disputes of material fact preclude the grant of summary judgment based on any of these exceptions.

1. "Current Model" Exception and the 36-Month Exception

Defendants rely primarily on the "current model" exception and the 36-month exception to the repurchase requirement. See id. §§ 59.1-352.1(2), (9). Under the Act, the "current model" exception excludes from repurchase items that are no longer "listed in the wholesaler's, manufacturer's or distributor's current sales manual or any supplements" at the time of the termination of the dealer agreement. See id. § 59.1-352.1(2). Here, Defendants argue that the XT models were not "current models" when Plaintiff provided its termination notice in November 2011, and thus not subject to repurchase.[4] Defendants make a similar argument with respect to the 36-month exception, which excludes from repurchase vehicles "purchased more than thirty-six months prior to notice of termination of the agreement." Id. § 59.1-352.6(9). Specifically, Defendants argue that Plaintiff purchased the two Classic model buggies in November 2007 and July 2008, both of which were purchased more than 36 months prior to Plaintiff's November 2011 termination notice.

In response, Plaintiff argues that Defendants cannot rely on either exception because the dealer relationship ended a year earlier when Defendants acquired the Bad Boy product line in October 2010. Specifically, Plaintiff argues that Defendants failed to honor Plaintiff's oral dealer agreement with Bad Boy Enterprises, which terminated the dealer agreement through "noncontinuance." See id. § 59.1-352.1 (defining termination to include "termination, cancellation, nonrenewal, or noncontinuance" of an agreement). As such, Plaintiff argues that Defendants are required to repurchase the vehicles because the XT model was a "current model"

---

[4] Defendants argue that BB Buggies published its first sales manual in December 2010, after acquiring the product line, and did not include the XT model in that sales manual. Moreover, BB Buggies never listed the XT model on any of its price sheets. Defendants also point out that Bad Boy Enterprises had stopped manufacturing the XT model prior to the asset transfer in October 2010. Thus, Defendants argue that the XT model buggies were not "current models" when Plaintiff's counsel sent the termination letter in November 2011.

in October 2010 and Plaintiff had purchased the Classic model buggies within the statutory window.

It is clear that the applicability of either exception hinges on when the parties' dealer relationship ended. If, for example, I accept Plaintiff's argument that the relationship ended in October 2010, it appears the statutory exceptions would not apply because the XT models were still "current models,"[5] and Plaintiff would have purchased the Classic model buggies within the 36-month statutory window. If the relationship was terminated by Plaintiff's letter in November 2011, however, then Defendant is correct that summary judgment would be appropriate because the XT models were clearly not "current models" at that time, and the 36-month window had closed.

After reviewing the evidence from both parties, I find that determining when the parties ended their relationship presents a genuine issue of material fact that precludes summary judgment. On the one hand, Defendants have provided support for their position that the relationship continued until Plaintiff sent its official notice of termination in November 2011. Foremost, BB Buggies never provided a termination notice to Plaintiff, signaling that BB Buggies assumed that the relationship continued after BB Buggies acquired the product line. In fact, BB Buggies explicitly stated that they believed the relationship was on-going in their correspondence with Plaintiff's counsel as late as November 2011. Moreover, Plaintiff's own actions bolster Defendants' position. Plaintiff waited almost a year after the asset transfer to

---

[5] Defendants also argue that the XT models were not "current models" in October 2010. Specifically, Defendants rely on the fact that Bad Boy Enterprises had stopped manufacturing the XT model prior to the asset transfer. This fact, however, ignores the Act's clear focus on whether the models were listed in the wholesaler's, manufacturer's, or distributor's current sales manual. While it is true that BB Buggies did not include the XT model in its December 2010 sales manual, and Bad Boy Enterprises stopped manufacturing the buggy prior to the asset transfer, this does not answer the question of whether the XT was listed in the applicable sales manual in October 2010. Because the Act focuses the inquiry on whether the model was listed in the applicable sales manual in October 2010, a fact which is in dispute, summary judgment is inappropriate.

send its official repurchase request and termination notice, which suggests that Plaintiff also considered the relationship to have continued after the asset transfer. Finally, it is clear that BB Buggies did not make any preparations to repurchase the buggies until after it received Plaintiff's official termination notice, further suggesting that BB Buggies assumed that the dealer relationship remained intact.

On the other hand, there is evidence to support Plaintiff's position that Defendants ended the dealer relationship in October 2010 by non-continuance when BB Buggies failed to honor Plaintiff's previous oral dealer agreement with Bad Boy Enterprises.[6] BB Buggies admitted that, after acquiring Bad Boy Enterprises' product line, BB Buggies did not consider Bad Boy Enterprises' non-written contractual relationships—like the oral agreement with James River—to have survived the asset transfer. (See Pl.'s Ex. C., 54:10-15 ("If we didn't have a written agreement, there was no need to terminate because we didn't have a contract so we didn't look at them as a dealer.").) Moreover, there is evidence to suggest that Defendants started treating Plaintiff like a non-dealer after the asset purchase. At Plaintiff's corporate deposition, for example, James River testified:

> [T]hey started treating us differently after that. They wouldn't give us parts at a dealer discount. We had to buy them at their retail number. And so—as we refused to sign their contract, they became more and more difficult to try to make—and [Defendant's]

---

[6] Defendants also argue that a termination cannot occur under the Act until one party provides written notice. (See Def.'s Br. pg. 6 ("Even if James River is correct that BB Buggies sought to terminate an agreement with James River, James River states that BB Buggies did not provide written notice of the alleged termination. The Act requires written notice such that without written notice there can be no termination.").) This argument, however, ignores the Act's broad definition of "termination." See Va. Code Ann. § 59.1-352.1. Moreover, Defendants' reading of the statute would allow a supplier to terminate a dealer relationship and then benefit from its failure to provide notice of that termination to the supplier. In effect, Defendants' reading of the statute thrusts an obligation upon the dealer to determine when the supplier has ended a dealer relationship, and then provide their own notice within enough time to avail itself of the repurchase remedy. This result does not comport with the very purpose of the Virginia Equipment *Dealer's Protection* Act.

> conversations with us were, "If you just sign the dealer contract, we can make all these issues go away."

(Pl.'s Ex. B, 95:1-5.) Similarly, there is little to suggest that the parties continued an actual, on-going dealer relationship. There is no evidence that Plaintiff purchased any Bad Boy products after BB Buggies acquired the product line, or that BB Buggies performed any warranty work that Plaintiff requested. In the context of the parties' protracted contract negotiations, this tends to suggest that if any relationship survived the asset transfer, it survived in name only.

As it presents a genuine dispute of material fact, the issue of when the parties terminated their relationship is a question for a jury. Since the applicability of either exception rests on this determination, Defendants cannot rely on these two exceptions to support summary judgment.

2. <u>Claims, Liens, and Encumbrances Exception</u>

Defendants next argue that summary judgment is appropriate because the Act excludes from repurchase any vehicles which are encumbered by a security interest. Specifically, the Act excludes from repurchase "[a]ny item of inventory for which the dealer does not have title free of all claims, liens, and encumbrances other than those of the supplier." Va. Code Ann. § 59.1-352.6(5). Defendants contend that the exception applies because Plaintiff did not clear all liens and encumbrances until April 2012.

Defendants argue that BB Buggies learned in December 2011 that Plaintiff's inventory might be encumbered. Specifically, Diane Sharpe, a former Credit Manager for BB Buggies, Inc., searched related liens on the vehicles for which Plaintiff requested repurchase. (<u>See</u> Def.'s Ex. J, ¶ 3-5.) According to Sharpe, the research revealed that the inventory might be encumbered and could not be transferred until a free and clear title status had been received. (<u>See id.</u>) On December 19, 2011, BB Buggies sent a letter to Plaintiff's counsel requesting that it provide some information "as to how [Plaintiff] will provide BBB with clear title to these

vehicles if and when they are repurchased." (See id. at Ex. J-1.)  Over four months later, on April 16, 2012, Plaintiff, through its attorney, responded that the vehicles were free from any encumbrances.  (See Def.'s Ex. K.)  As such, Defendants argue that, "[b]y the time that James River was able to provide all vehicles for repurchase free of any liens or encumbrances, the XT was no longer a current model and the Classics had been purchased more than 36 months earlier." (Def.'s Br. pg. 13.)

Defendants' purported use of the exception, however, relies on an unfair reading of the statute.  Specifically, Defendants' argument conflates three statutory exceptions.  The Act clearly excludes from repurchase encumbered vehicles and/or vehicles purchased more than 36 months prior to the notice of termination and/or vehicles that are not "current models."  Compare Va. Code Ann. § 59.1-352.6(5), with id. § 59.1-352.6(9), and id. § 59.1-352.6(8).  These exceptions cannot be combined, as Defendants suggest, to create a new exception.  The fact that Plaintiff waited four months to respond to Defendants' letter is immaterial in determining whether the vehicles were, in fact, encumbered and thus not subject to repurchase.

Answering the question of whether the vehicles were encumbered, however, would require that I resolve a genuine issue of material fact.[7]  Defendant argues that Plaintiff admitted that the vehicles were encumbered when, in its corporate deposition, Plaintiff testified that "all of this equipment has been on our borrowing base all along," that, "for every dollar that we have tied up in their inventory, that's a dollar that I have borrowed today through Bank of America," and that "[the bank has] a security interest in all of our inventory."  (Phil Johnson Dep. 45:4-46:5, July 12, 2013.)  Plaintiff countered with colorable evidence that the vehicles were never

---

[7] I have received and considered Plaintiff's Memorandum in Opposition to Defendants' Supplemented Reply Memorandum in Support of Motion for Partial Summary Judgment [ECF No. 47], which was filed on September 5, 2013. For the reasons contained herein, the supplemented briefing does not change the analysis with respect to Defendants' Motion for Partial Summary Judgment.

encumbered.  Specifically, Bertsch Cox, CFO of James River, submitted a declaration in which he states that James River's Bad Boy inventory has never been encumbered.  (See Pl.'s Ex. H, ¶ 6-8.)  Moreover, there is some evidence that BB Buggies did, in fact, repurchase other buggies from James River without issue.

Plaintiff's attempt to create an issue of fact by disagreeing with itself is not persuasive. "A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct."  Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) (citation omitted).  Nevertheless, accepting Defendants' argument and ignoring the Bertsch declaration, there is a question of whether Plaintiff's "floor plan" credit system with Bank of America constitutes a lien or encumbrance under the Act.  (See Johnson Dep. 45:5-6.)  If James River could sell any buggy without the consent of the bank, and pass title free and clear of any security interest, then the buggies may have been "encumbered," but they could have been transferred free of any security interest.  (See Johnson Dep. 46:1-5.) Whether the vehicles were in fact encumbered is thus a point of dispute, and summary judgment is inappropriate with respect to the claims, liens, and encumbrances exception to the Act.

3.  "New, Unused, and Undamaged Condition" Exception

Defendants also argue that they are not required to repurchase the 2008 Classic model and one of the XT model buggies because these buggies were not in "new, unused and undamaged condition" as required under the Act.  See Va. Code Ann. § 59.1-352.6(4).  Plaintiff, however, disputes the condition of the vehicles.  Moreover, Plaintiff argues that the small tear in the XT model referenced above is *de minimis* and insufficient to establish that the vehicles was not in "new, unused and undamaged condition," for purposes of the Act.  Because this issue is largely factual, it is difficult at this time to determine the amount of damage to the vehicles, and

whether that damage rises to the level envisioned by the Act. Accordingly, summary judgment with respect to the "new, unused, and undamaged condition" exception is inappropriate.

## II. Plaintiff's Request for Storage Fees is Disputed

Defendants also move for summary judgment with respect to Plaintiff's claim for $22,500 in storage fees. The parties did not address this issue at oral argument, and have offered scant evidence on the issue in their briefings to the Court. What evidence the parties have offered, however, presents a material dispute. As a result, summary judgment is inappropriate with respect to the issue of damages.

## III. Textron is Not Liable Under the Act

Defendants argue that summary judgment is appropriate with respect to Textron because Textron and James River never had a dealer agreement as envisioned by the Act. Defendants' argument is well-founded.

The Act defines "agreement" as a contract or agreement between a dealer and a wholesaler, manufacturer, or distributor. Va. Code Ann. § 59.1-352.1. In the absence of an "agreement," there is no liability under the Act. Here, there is no evidence to suggest that Plaintiff entered into a dealer agreement with Textron.[8] In fact, James River admitted in its corporate deposition that it had no formal or informal agreement with Textron apart from its relationship with BB Buggies. (See Def.'s Ex. H, 76:12-77:1.)

Despite its best efforts, Plaintiff fails to provide any evidence to the contrary. Plaintiff first argues that Textron is liable under the Act because BB Buggies lacks the authority to transact business in Virginia, and BB Buggies has to rely on Textron's authority to conduct its business. This fact alone, however, is insufficient to subject Textron to liability under the Act.

---

[8] There is also some question as to whether Textron would even qualify as a "supplier" under the Act. See Va. Code Ann. § 59.1-352.1.

BB Buggies' use of its parent company's business license does not constitute a dealer agreement, nor does it make Textron a party to the dealer agreement between BB Buggies and James River. In the alternative, Plaintiff argues that Textron is liable under the Act because all of BB Buggies' sales have to "go through" E-Z-Go, a division of Textron. (Textron's Answer to Am. Compl. ¶ 4). This fact establishes, at most, that Plaintiff had some dealings with Textron. It does not establish that Plaintiff and Textron entered into a dealer agreement as defined by the Act.

The only real connection between Plaintiff and Textron is the fact that BB Buggies is a wholly owned subsidiary of Textron. Finding liability on that basis, however, fails to comport with the terms of the Act and conflicts with the well-established legal principle that parent companies are not liable for the acts of a subsidiary. See United States v. Bestfoods, 524 U.S. 51, 61 (1998) (holding that a parent company is generally not liable for the acts of a subsidiary). As such, I will grant summary judgment with respect to Textron.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part. Specifically, Defendants' Motion is **GRANTED** with respect to James River's claims against Textron. Defendants' Motion is **DENIED** with respect to all other claims arising under the Virginia Equipment Dealers Protection Act, including claims for storage costs, against BB Buggies, Inc.

The clerk is directed to send a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

Entered this 6th day of September, 2013.

s/Jackson L. Kiser
SENIOR UNITED STATES DISTRICT JUDGE